LAMONT, CORLISS & CO. ET AL. *v.* UNITED STATES (No. 3076)[1]

United States Court of Customs Appeals, January 29, 1929

*B. A. Levett* for appellants.

*Charles D. Lawrence*, Assistant Attorney General (*Kenneth G. Osborn*, special attorney, of counsel), for the United States.

*Marion De Vries* and *George Roscoe Davis* (*Jesse P. Crawford* of counsel), amici curiæ.

[1] T. D. 43224.

[Oral argument October 3, 1928, by Mr. Levett, Mr. Lawrence, and Mr. Crawford]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

Merchandise described in the invoices as stearic acid was assessed for duty by the collector at the port of New York at 25 per centum ad valorem under the provision for "all other acids and acid anhydrides not specially provided for," contained in paragraph 1 of the Tariff Act of 1922, which reads as follows:

PAR. 1. Acids and acid anhydrides: Acetic acid containing by weight not more than 65 per centum of acetic acid, three-fourths of 1 cent per pound; containing by weight more than 65 per centum, 2 cents per pound; acetic anhydride, 5 cents per pound; boric acid, 1½ cents per pound; chloroacetic acid, 5 cents per pound; citric acid, 17 cents per pound; lactic acid, containing by weight of lactic acid less than 30 per centum, 2 cents per pound; 30 per centum or more and less than 55 per centum, 4 cents per pound; and 55 per centum or more, 9 cents per pound: *Provided*, That any lactic-acid anhydride present shall be determined as lactic acid and included as such: *And provided further*, That the duty on lactic acid shall not be less than 25 per centum ad valorem; tannic acid, tannin, and extracts of nutgalls, containing by weight of tannic acid less than 50 per centum, 4 cents per pound; 50 per centum or more and not medicinal, 10 cents per pound; 50 per centum or more and medicinal, 20 cents per pound; tartaric acid, 6 cents per pound; arsenic acid, 3 cents per pound; gallic acid, 8 cents per pound; oleic acid or red oil, 1½ cents per pound; oxalic acid, 4 cents per pound; phosphoric acid, 2 cents per pound; pyrogallic acid, 12 cents per pound; stearic acid, 1½ cents per pound; and all other acids and acid anhydrides not specially provided for, 25 per centum ad valorem.

The importers protested the assessment of duty, claiming that the merchandise was "stearic acid" and dutiable as such under the *eo nomine* provision therefor in paragraph 1.

It was the contention of counsel for the importers on the trial below, and it is their contention here, that the involved merchandise was definitely, uniformly, and generally bought and sold and known in the trade and commerce of the United States as "stearic acid" at and prior to the enactment of the Tariff Act of 1922. It is claimed that this fact is established by every qualified commercial witness who testified in the case.

The Government contends, and its contention was sustained by the court below, that only such merchandise as conforms to certain specifications and which has certain definite physical properties is designated in the trade and commerce of the United States as "stearic acid"; that the imported merchandise does not conform to these requirements; and that these facts are established by a preponderance of the evidence. A more detailed statement of the claims of the parties will be hereinafter set forth.

It appears from the briefs of counsel for the parties, and from the statements of counsel for appellants made in open court at the time the case was argued here orally, that the precise issue in the case is: Was the imported merchandise of the character of that involved, at

and prior to the enactment of the Tariff Act of 1922 (September 21, 1922), definitely, uniformly, and generally bought and sold and designated in the trade and commerce of the United States as stearic acid? If it was, the judgment should be reversed. If it was not, the judgment should be affirmed. We proceed, therefore, to a consideration of the record in the case.

The importers established that merchandise like that involved in this case had been imported into the United States at and prior to the enactment of the Tariff Act of 1922; and that the imported merchandise, as stated by one of the witnesses, was composed of the following materials:

The raw materials consist of palm oil, cocoa butter, fatty acids, Chinese vegetable tallow, beef tallow, mutton tallow, bone fat and hog fat. These products are used in the following proportions: About 50 per centum of palm oil and/or Chinese vegetable tallow and/or cocoa butter fatty acids; the remaining 50 per centum is made of the other fats named. It is immaterial what proportion the palm oil. Chinese vegetable tallow or cocoa butter fatty acids may bear to each other, so long as in the aggregate they constitute approximately 50 per centum. It is also immaterial what proportion the other fats mentioned bear to one another, so long as they constitute 50 per centum in the aggregate. The proportions vary following market conditions.

We sum up the testimony of the witnesses for appellants. M. W. Parsons, owner of the M. W. Parsons Plymouth Organic Laboratories, an "importer of Russian mineral stearic acid, waxes," said that, while his company had not dealt in as large quantities as others engaged in the trade, he had sold an imported product like that involved in this case as "stearic acid" and as "stearol" at wholesale, for many years prior to, and at the time of the enactment of the Tariff Act of 1922, in every State in the United States. He had never sold stearic acid under any specifications. He said that the term "stearol" was used so that his customers would know that they were getting imported stearic acid. He identified certain sale bills of his company dated, respectively, June 16, June 24, September 28, November 4, and December 3, 1921, which were introduced in evidence as collective Exhibit No. 1. They were put in evidence for the purpose of corroborating his statement that he had sold a foreign product as stearic acid at and prior to the time of the passage of the Tariff Act of 1922. An examination of these exhibits shows that in each instance the merchandise was sold as "imported stearic acid."

Arthur H. Hoffman, of the Strohmeyer & Arpe Co., importer—appellant in suit No. 3081, decided concurrently herewith—testified that he had sold at wholesale imported merchandise like that involved in this case as "stearic acid," throughout the United States at and prior to the time of the enactment of the Tariff Act of 1922. The only qualifying terms used were "single pressed," "double pressed," and "triple pressed." He had not sold large quantities,

comparatively, prior to 1922, and did not recall the name of anyone to whom he had made sales. He never sold stearic acid under any specifications; but he had sold the imported product and domestic stearic acid interchangeably to some customers and never had a complaint from any of them.

Elizabeth Mary Meyer, of Innis Speiden & Co., dealers in chemicals, testified that she had sold an imported product like that involved as "stearic acid" throughout the United States "Before the war and prior to 1922." Her sales were at wholesale. She said that the common method, in the trade, of determining whether a substance was stearic acid was to taste it. She sold the imported product and domestic stearic acid to the same trade.

George Perkins Dunn, of Smith & Nichols (Inc.), dealers in commercial waxes, testified that he sold merchandise like that involved at and prior to 1922 in wholesale quantities; according to his testimony, "Mostly through New England, Atlantic States, and the Middle West." He could recall selling in only two cities in the New England States—Bridgeport and Boston. He could not recall selling the imported product in any city in the "Middle States." However, in explanation, he said: "These recollections would be only where we have sold stearic acid indiscriminately. I would not be able to identify whether it was the imported or not, because we made no distinctions." He sold the imported product and the domestic stearic acid to the same houses. In this connection he said:

Q. Have you handled this imported merchandise prior to September, 1922?—A. I have.
Q. Sold it throughout this country?—A. Yes, sir.
Q. That is the imported merchandise?—A. Yes, sir.
Q. Under what name was that sold by you?—A. Stearic acid.
Q. *Was it ever sold by, or ordered from you under any other name?*—A. *Yes; on occasions.*
Q. *What name would that be?*—A. *Stearine.*
Q. *Was that a special name for a particular brand of stearic acid?*—A. *No; used indiscriminately.*
Q. On an order for stearic acid, would you understand what was meant?—A. I would.
Q. Would it be this article?—A. This article.
Q. Have you bought in these markets domestic stearic acid?—A. I have.
Q. And sold it again?—A. I have.
Q. In selling the domestic did you sell that in competition with the imported?—A. Indiscriminately.
Q. Did you sell it to the same houses?—A. I did.
Q. Under the same name?—A. Oh, yes; certainly. (Italics ours.)

He made sales to manufacturers of cosmetic and "buffing compounds," but he never made sales under specifications.

The Government submitted the testimony of 13 witnesses who had been dealing in stearic acid in the wholesale markets of the United States at and prior to the enactment of the Tariff Act of 1922. It

would unnecessarily extend this opinion to refer in detail to the testimony of each of these witnesses. It may be said, however, that their testimony did not vary substantially as to their understanding of the term "stearic acid" as it was used in the trade and commerce of the United States. Some of them had both bought and sold stearic acid for many years prior to the enactment of the Tariff Act of 1922 in the wholesale trade throughout the United States; others had bought and sold it in the wholesale trade in particular portions of the United States. Only one of the Government witnesses, however, said that his trade experience was confined to one of the principal markets of the United States. Each of these witnesses stated in substance that stearic acid, as bought and sold and designated in the wholesale trade of the United States, was made from animal fats; and that it had a melting point (titer test) of not less than 128° F., an iodine value of from 6 to 8, and a definite crystalline structure. Speaking collectively, these witnesses had bought or sold stearic acid for practically every commercial purpose to which the product is adapted. They agreed that the stearic acid of commerce, at and prior to the enactment of the Tariff Act of 1922, consisted of "double pressed and triple pressed"; that the melting point and iodine value varied slightly according to whether it was "double pressed" or "triple pressed"; that the trade understood that a double-pressed stearic acid had a melting point of not less than 128° F. and an iodine value of from 6 to 8, with a definite crystalline structure; and that the triple-pressed stearic acid was subjected to one more pressing than double-pressed stearic acid, for the purpose of eliminating more oleic acid; that in triple-pressed stearic acid the iodine value would be lower and the melting point higher than in the double-pressed.

They agreed that both the double and triple pressed stearic acid had a definite crystalline needle-point formation or structure. They said, with the exception of the witness Morgan, and his testimony is not clear in this regard, that at and prior to the enactment of the Tariff Act of 1922, single-pressed stearic acid was neither bought nor sold as stearic acid in the wholesale trade of the United States, but that it had been used to some extent during the past two or three years. Each of the witnesses for the Government stated that commercial stearic acid must have and did have a "needle-point crystalline structure." Some of these witnesses had been offered the imported stearic acid prior to the enactment of the Tariff Act of 1922 as "imported stearic acid," but they had not used it and had neither bought nor sold any of it. One said that it had been offered to him as "imported stearic acid" and "stearine." Others said that they had bought merchandise like the imported product since the enactment of the Tariff Act of 1922, under the names of "imported stearic acid," "stearine," "stearic acid," "palmitic acid," and "Dutch stearine."

Some of the witnesses said that they had analyzed it and that it was not the stearic acid of the trade and commerce of the United States. One or two who had purchased it said that they had tried to use it as stearic acid without success.

One of the Government witnesses, Annabelle Murphy, of the MacMillar Candle Co., of Syracuse, N. Y., who had purchased some of the imported material for use in the manufacture of candles, one of the important uses to which commercial stearic acid is put, said:

A. The candle manufactured from this, with the melting point higher, with its iodine value, and no crystalline structure, won't hold its shape. It won't hold its color, and it will not burn.

Q. What results did you obtain in the use of the stearic acid as opposed to this you have just described?—A. The candle will hold its shape. It will also hold its color, and it will burn.

Q. Based upon your experience then, would the exhibit merchandise represented by Exhibit 2, such as you have experimented with, be accepted by you as a fair substitute for stearic acid?—A. Oh, no.

None of the witnesses for the Government had sold merchandise like that involved in this case, and, with the exception of one or two, none had ever purchased it. Each of the Government witnesses, after having been told that the imported merchandise did not cyrstallize in needles, and that it had a melting point of approximately 125.5° F., and an iodine value of approximately 12, said that, within his knowledge and experience, it was not known or designated in the trade and commerce of the United States as stearic acid; and that a product having those characteristics would be excluded from that class of merchandise designated in the trade and commerce of the United States as stearic acid. They agreed that stearic acid was always bought and sold in the trade under specifications, or as double-pressed or triple-pressed; and that it was always understood by the purchaser and the seller that such acids must meet the trade requirements as to melting point, iodine value, and needle-point crystalline structure. They testified that it was impossible to say whether a product was stearic acid without a chemical analysis to determine its melting point, iodine value, and as to whether it had a needle-point crystalline structure. If it had a proper melting point, a correct iodine value, and had a definite needle-point crystalline structure, it was considered stearic acid. If it did not conform to these requirements it was not stearic acid.

The Government offered in evidence copies of the chemist's reports of analyses made of the imported merchandise covered by the various protests, as Exhibits 3, 4, 5, 6, 7, 8, 9, and 10. These reports show that none of the samples of the imported merchandise had a needle-point crystalline structure. The melting point of the various samples ranged from 119.7° to 126.4° F., and the iodine values from 10.3 to 27.2.

We conclude the statement of the substance of the evidence offered by the Government with quotations from the testimony which, we think, illustrate the declared understanding of each of the Government witnesses.

Mr. E. E. Werk, one of the Government witnesses, said:

Q. Mr. Werk, based upon your trade experience as a buyer and seller of stearic acid at and immediately prior to September, 1922, what was your understanding of the term "stearic acid" as gathered from your trade experience?—A. It was a definite article made from animal fatty acids, having a melting point of not less than 128 degrees Fahrenheit, and iodine value of six to eight, and a definite distinct crystalline structure.

Q. Did you handle both double-press and triple-press stearic acid prior to 1922?—A. I did.

Q. And do you now, have you since and before 1922?—A. I beg your pardon?

Q. Have you handled both double and triple press before and since 1922?—A. I have.

Q. Does the iodine number and the titer number vary, depending on whether it is double or triple press?—A. They do.

Q. Whether or not the crystalline structure is always present in stearic acid?—A. It is

Q. Now, I show you a portion of Collective Exhibit 2. Would you as prudent business men undertake to identify that without further information concerning it?—A. I would not.

Q. Suppose it appeared that this commodity had an iodine number of about 12.2, a titer number of 125.5 Fahrenheit, and that it did not possess the needle-point crystallization, can you tell us whether or not that would be included in the class of stearic acid as you have defined it here to-day?

* * * * * * *

A. It would not be included in the class of commercial stearic acid.

Q. Why not?—A. Because it is deficient in iodine value, titer, and absence of crystalline construction or structure.

The witness August J. Spieler, a manufacturer of stearic acid, said:

A. Stearic acid is the product of cold pressing and a hot pressing of animal fatty acids. And that product should have a melting point of 128 degrees Fahrenheit, and an iodine number of from six to eight. And when melted, slowly cooled, it should crystallize in needle-point crystallization formation.

* * * * * * *

Q. Suppose I told you it had an iodine value of 12.2, a titer test of 125.5 Fahrenheit, and that it showed no needle-point crystalline formation. Will you tell us whether an article or commodity so described would be included in the trade class of stearic acid as you have testified?—A. It is not stearic acid.

Q. Would it be known as stearic acid by you?—A. No.

Q. Or by the trade with which you come in contact?—A. It would not.

Q. Why not?—A. Because it has not got the characteristics of stearic acid. It lacks the crystalline structure, it lacks in iodine; that is to say it is too high in iodine and it is too low in melting point.

* * * * * * *

Upon this record the court below held, Brown, Justice, dissenting, as we understand its decision, that appellants had failed to prove by

a preponderance of the evidence that the imported merchandise was definitely, uniformly, and generally bought and sold and designated in the trade and commerce of the United States as stearic acid, at and prior to the enactment of the Tariff Act of 1922.

Counsel for appellants contend that it has been established by a preponderance of the evidence that the involved merchandise, at and prior to the enactment of the Tariff Act of 1922, was definitely, uniformly, and generally bought and sold and designated in the trade and commerce of the United States as "stearic acid"; that the witnesses for the Government who had neither bought nor sold the imported product were not qualified to testify as to its commercial designation; that each of the Government witnesses who had bought or who had otherwise come in contact, commercially, with the imported product corroborated the testimony of appellants' witnesses; and that the judgment below is contrary to the weight of the evidence.

Counsel for the Government and amicus curiæ contend that at and prior to the enactment of the Tariff Act of 1922, the trade had a definite, uniform, and general understanding of the term "stearic acid." It is claimed that the trade designated as "stearic acid" only such products as conformed to certain trade specifications. These trade specifications were said to be as follows: The product must be made of animal fats, and have a melting point of from 128°–135° F., according to whether it was double or triple pressed; an iodine value of from 3 to 8, according to whether it was double or triple pressed; and a definite needle-point crystalline structure. It is further contended that the imported merchandise did not conform to the trade specifications; that it was not within the trade understanding of the term "stearic acid," and was not designated as such; that it would not be accepted as a good delivery for stearic acid; and that the judgment of the court below is sustained by a preponderance of the evidence

The burden of proving commercial designation is upon the party who raises the issue. It may be established by a fair preponderance of the evidence. Furthermore, the findings upon this issue by the court below must be sustained, unless it appears that there is no evidence to support it, or that it is contrary to the weight of the evidence. *La Manna, Azema & Farnan* v. *United States*, 14 Ct. Cust. Appls. 289, T. D. 41908; *Watson, Geach & Co. (Inc.)* v. *York Metal & Alloys Co.*, 14 Ct. Cust. Appls. 449, T. D. 42112, and cases cited.

Was the imported merchandise definitely, uniformly, and generally designated in the trade and commerce of the United States as "stearic acid" at and prior to the enactment of the Tariff Act of 1922? If it was, it is of no consequence whether it was, in fact, stearic acid. *La Manna, Azema & Farnan* v. *United States*, *supra*, citing 200 Chests of Tea, 9 Wheat. 428.

In the latter case the Supreme Court said:

If we were to advert to scientific classifications, for our guide on the present occasion, it is most manifest, from the works cited at the bar, that bohea is a generic term, including under it all the black teas, and not merely a term indicating a specific kind. But it appears to us unnecessary to enter upon this inquiry, because, in our opinion, Congress must be understood to use the word in its known commercial sense. The object of the duty laws is to raise revenue, and for this purpose, to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists or botanists. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation.

So, here, if the imported merchandise had acquired a definite, uniform, and general trade designation as stearic acid, at and prior to the enactment of the Tariff Act of 1922, it is immaterial that it is not, in fact, stearic acid.

The witnesses for the Government were dealers in commercial stearic acid. They, speaking collectively, had been buying and selling stearic acid in large quantities in all of the principal markets of the United States. It is true that many of them had neither bought nor sold merchandise like that involved. But each of them had been dealing extensively in stearic acid, and were undoubtedly qualified to testify as to the trade requirements and as to the various products designated in the trade as stearic acid. Their evidence is, in a sense, negative in character, but it is not, for this reason, incompetent. Obviously, when 13 qualified commercial witnesses, who for many years have been dealing extensively in stearic acid in the principal markets of the country, testify that, in their experience, the trade designated as stearic acid only such products as were made of certain materials and conformed to certain specifications, and that the imported product, because of its failure to meet these requirements, could not be used as and would not be accepted as a good delivery for stearic acid, and that it was not so designated in the trade, such evidence, if believed by the trial court, would be sufficient to sustain a finding that the imported product was not *definitely, uniformly, and generally* designated in the trade as stearic acid. Of course, this finding does not negative the proposition that it was bought and sold as stearic acid. It may have been. However, the finding does negative the proposition, and this was the precise issue before the court, that it was so bought and sold in the principal markets of the country, definitely, uniformly, and generally. *Smillie & Co.* v. *United States*, 12 Ct. Cust. Appls. 365, T. D. 40520, and cases cited.

But it is argued by counsel for appellants that, unless a witness has bought or sold a product like that involved, he is not competent to testify on the issue of commercial designation; and that, as it appears the product dealt in by the witnesses for the Government is not the same as that involved, they were not competent witnesses. Our decision in the case of *United States* v. *Globe Overseas Corporation*, 13 Ct. Cust. Appls. 10, T. D. 40849, is cited as authority for this contention. We there said:

The Government assigns as error the refusal of the trial court to permit the introduction of evidence to prove that a class of articles manufactured in the United States, of material similar to some extent to that of which the imported articles were made, but of different shapes and designs, was known in the trade as "toys," in order to prove commercial designation of the imported articles.

It does not appear from the testimony of the Government's witness that he had ever bought or sold merchandise which was in any respect similar to the imported articles, except as to the material of which it was composed. There was no evidence that the domestic merchandise was used in substantially the same manner, or for the same purposes for which the imported articles were used.

\* \* \* \* \* \* \*

It is evident from the testimony of the witness that he was not qualified to testify on the question of commercial designation. He had never bought or sold, nor was he familiar with the trade designation of, articles *like* the imported articles, although he had dealt in articles to some extent *similar* to those imported.

In that case the Government was attempting to prove the commercial designation of an imported article by witnesses who had not only not dealt in the article, but who had not bought or sold an article like it, by proof which was limited to the commercial designation of a domestic article in no respect similar, except as to the material of which it was composed. There was no evidence that the imported and domestic articles were used in the same manner, or for substantially the same purposes. Nor was there any evidence that the imported article was included within the trade term "toys." The evidence of the Government in that case was precisely what counsel for importers erroneously, we think, claim the evidence is here. The evidence here is not confined to the trade designation of a domestic stearic acid. It goes farther, and tends to establish that the involved product is excluded from that class of merchandise designated in the trade as stearic acid. Furthermore, the evidence in this case meets the issue squarely, while in *Globe Overseas Corporation* case, *supra*, the evidence of the Government did not meet the issue at all.

Suppose, for the purpose of illustration, that, in an effort to prove that oranges were dutiable under an eo nomine provision for peanuts, four witnesses for the Government testified that they had sold oranges in the trade as peanuts. Would an importer be compelled to rely on the testimony of dealers in oranges in an effort to meet the case of the Government? Is not the trade involved that which deals in

peanuts? Obviously, in order for one to qualify as a trade witness on the subject of peanuts, it would not be necessary that he be a dealer in oranges.

It might be said that two of the witnesses for appellants did not testify that they sold merchandise like that imported, definitely, uniformly, and generally, as stearic acid. One, M. W. Parsons, sometimes sold it as "stearol." Another, George Perkins Dunn, occasionally sold it as "stearine." Furthermore, the witnesses for appellants, M. W. Parsons and Arthur Hoffman, each said that his sales were comparatively small.

From a careful consideration of the record, we are satisfied that the finding of the court below is not contrary to the weight of the evidence. The judgment is, therefore, *affirmed.*