SWIFT & CO., A CORPORATION *v.* UNITED STATES (No. 4394)[1]

[1] C. A. D. 230.

United States Court of Customs and Patent Appeals, March 1, 1943

*Curtis E. Loehle* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard H. Welsh* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

[Oral argument December 2, 1942, by Mr. Loehle and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division.

Imported merchandise, consisting of oleostearin, was assessed with duty by the collector at the port of Jacksonville, Fla., at 1 cent per pound under paragraph 701 of the Tariff Act of 1930, and, in addition thereto, a tax of 3 cents per pound was levied against the merchandise under the provisions of section 701 of the Revenue Act of 1936 (49 Stat. 1742), amending section 601 (c) (8) of the Revenue Act of 1932, as amended.

The importer protested, claiming that the oleostearin was not subject to the tax of 3 cents per pound under the provisions of section 701 of the Revenue Act of 1936 for the reason that it was not derived either directly or indirectly from tallow. It was conceded in appellant's protest, however, that the oleostearin was properly assessed with duty at 1 cent per pound under paragraph 701 of the Tariff Act of 1930.

The statutes, so far as pertinent, read:

PAR. 701. * * * tallow, one-half of 1 cent per pound; oleo oil and oleo stearin, 1 cent per pound; dried blood albumen, light, 12 cents per pound; dark, 6 cents per pound.

SEC. 701. TAX ON CERTAIN OILS.

The first sentence of section 601 (c) (8) of the Revenue Act of 1932, as amended, is amended to read as follows:

(8) Whale oil (except sperm oil), fish oil (except cod oil, cod-liver oil, and halibut-liver oil), marine-animal oil, tallow, inedible animal oils, inedible animal fats, inedible animal greases, fatty acids derived from any of the foregoing, and salts of any of the foregoing; all the foregoing, whether or not refined, sulphonated, sulphated, hydrogenated, or otherwise processed, 3 cents per pound; * * * any article, merchandise, or combination (except oils specified in section 602½ of the Revenue Act of 1934, as amended), 10 per centum or more of the quantity by weight of which consists of, or is derived directly or indirectly from, one or more of the products specified above in this paragraph or in section 602½ of the Revenue Act of 1934, as amended, a tax at the rate or rates per pound equal to that proportion of the rate or rates prescribed in this paragraph or such section 602½ in respect of such product or products which the quantity by weight of the imported article, merchandise, or combination, consisting of or derived from such product or products, bears to the total weight of the imported article, merchandise, or combination * * *.

In the case of *Swift & Co., a Corporation* v. *United States,* 27 C. C. P. A. (Customs) 181, C. A. D. 83, merchandise like that here involved was before us for consideration. (The record in that case was made a part of the record in the instant case.) In affirming the judgment of the trial court in that case, we held, among other things, on the evidence submitted, that oleostearin was produced from oleo stock; that oleo stock was produced, as therein described, from *unrendered* beef fats; and that as the common meaning of the term "tallow" included unrendered beef fats, oleo stearin "was derived directly or indirectly" from "tallow" and was, therefore, subject to the tax of 3 cents per pound under section 701, *supra.* We there stated that as appellant had failed to establish that in the trade and commerce of the United States the commercial meaning of the term "tallow" differed from its common meaning, it would be presumed, for the purpose of our decision, that the commercial meaning of the term was the same as its common meaning, citing the case of *Rice-Millers' Association, American Manufacturers* v. *United States and Oberle (Inc.),* 15 Ct. Cust. Appls. 355, T. D. 42560.

In the instant case, counsel for appellant introduced evidence for the purpose of establishing that in the trade and commerce of the United States the term "tallow" on and prior to the date of the enactment of section 701, *supra* (August 21, 1936), was definitely, uniformly, and generally restricted to rendered animal fats, such as beef and mutton fats, whereas counsel for the Government introduced evidence for the purpose of establishing that in the trade and commerce of the United States the term "tallow" on and prior to the date of the enactment of section 701, *supra,* was not definitely, uniformly, and generally restricted to *rendered* animal fats, such as beef and mutton fats, but, on the contrary, included *unrendered* beef and mutton fats.

Although counsel for appellant argues to some extent in his brief that *unrendered* beef fat is not within the common meaning of the term "tallow" and that this court erred in the *Swift & Co.* case, *supra,* in holding that it was, that question was not raised in the trial court, nor is it raised here in appellant's assignment of errors. Accordingly, that issue, which was disposed of in the *Swift & Co.* case, *supra,* is not now before us. Commercial designation was the sole issue presented to the trial court, and, although in appellant's assignment of errors it is claimed that the trial court erred in overruling objections to the introduction in evidence of certain testimony on behalf of the Government, those questions are not referred to in the brief of counsel for appellant and, therefore, will not be considered here.

On the record presented, the trial court held that appellant had failed to establish by a preponderance of the evidence that at and prior to the enactment of section 701 of the Revenue Act of 1936, *supra,* the meaning of the term "tallow" was restricted in the trade

and commerce of the United States to *rendered* beef and mutton fats, and that it had been established by evidence introduced by the Government that, in at least 11 states, the trade understanding of that term included *unrendered*, as well as *rendered*, beef and mutton fats

The burden of proving commercial designation was upon appellant, and the findings of the trial court upon that issue must be sustained unless it appears that there is no evidence to support them or that they are contrary to the weight of the evidence. *Lamont, Corliss & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 488, T. D. 43224.

Appellant's witness Vincent J. Bullen, employed by appellant for 18 years as department manager, stated that he was in charge of selling edible and inedible tallow, grease, oleo oil, oleo stock, and oleostearin; that for 7 years he was assistant manager of the department which handled those products; that both edible and inedible tallow consisted of *rendered* beef or mutton fats; that he had sold such products throughout the United States; that from his observation and experience the word "tallow" was restricted definitely, uniformly, and generally in the wholesale trade in the United States to *rendered* beef or mutton fats; and that the term "tallow," so far as he knew, had never been used to designate *unrendered* beef or mutton fats. The witness stated on cross-examination that appellant had purchased unrendered fats, but that he did not know under what name or names such fats were purchased.

Appellant's witness D. P. Cosgrove stated that he was a broker in fats and oils; that he was connected with Sterne & Son Co.; that he had been engaged as a broker in fats and oils, such as tallow, grease, and other articles, for over 30 years; that during that period he bought and sold both edible and inedible tallow throughout the United States; that edible and inedible tallow are *rendered* beef or mutton fats; that edible tallow is sold principally to shortening manufacturers, whereas inedible tallow is sold to soap manufacturers, etc.; and that both the edible and inedible tallow are sold in tank car lots. *The witness also stated that the people to whom he sells cannot use unrendered fat*, and that in his experience and observation the term "tallow" is restricted definitely, uniformly, and generally in the wholesale trade in the United States to *rendered* beef or mutton fats. On cross-examination he *stated that he had never bought or sold unrendered beef or mutton fats; that he never made any investigation to ascertain how such products were sold; and that he did not know under what name or names they were sold.*

The witness Raymond T. Williams, testifying for appellant, stated that he was connected with E. G. James & Co., brokers in packinghouse products; that he had been in the employ of that company for

about 15 years; that the byproducts of his company were sold under his personal supervision and direction; that he had sold *inedible* tallow throughout the United States in quantities ranging from 5 barrels to 5 and 10 tank-car lots; that both the edible and inedible tallow are *rendered products;* and that his company sells edible tallow to the shortening trade, and the inedible tallow to soap manufacturers. When asked whether his company had sold *unrendered* fats, he said: "To some extent we could classify them as that. It depends entirely on market conditions." The witness also stated that *unrendered fats* were never designated by him as "tallow," and that from his experience and observation the term "tallow" was definitely, uniformly, and generally restricted in the trade and commerce of the United States to *rendered* fats. On cross-examination he stated that the only product his company sold as "tallow" consisted of *rendered fats.* When asked whether he knew whether *unrendered fats* were sold as "tallow," he said: "*I wouldn't know.*" [Italics ours.] He further stated that he could not say from his personal knowledge that the term "tallow" was restricted to *rendered* fats in the trade and commerce of the United States, and that when tallow was ordered from his company it was understood that *what was wanted was the rendered product.*

Appellant's witness W. T. Bresnehan testified that he was connected with John W. Hall & Co. in the packing house brokerage business; that he had been with that company for 20 years; that he was in charge of the sales of edible and inedible tallow for that company; that edible and inedible tallow are rendered beef or mutton fats; that he sold edible tallow to shortening manufacturers, and inedible tallow to soap and lubricating manufacturers; that he sold such products throughout the United States and Canada; and that *he never sold unrendered beef or mutton fats* either as *edible* or *inedible tallow.* On cross-examination he stated that when he was young he used to work in a butcher shop, at which time he sold "raw" fat as "shop scrap and bones"; that he knew that butchers sell their entire output of *unrendered* fats; that such *unrendered fats are sold in enormous quantities;* that *he did not know under what name they were sold;* and *that he would not consider them tallow, because people to whom his concern sold tallow could not use raw fats.*

Alfred Henry Goedert, a witness for appellant, testified that he was manager of the Jones Chambliss Co., engaged in the packing-house business; that he had been with that company for about 30 years; that, at the time of the taking of his testimony, his company was producing grease; that for many years his company also produced and sold tallow under his supervision, most of the sales being made in Cincinnati, some in Philadelphia, and some in Newark, N. J. When asked what he meant by the word "tallow," he said that tallow is

rendered fat. The witness further stated that he had never seen or heard of *unrendered* fats being traded in as "tallow," and that all the tallow he had sold consisted of rendered fats. On cross-examination he stated that although his company had bought *unrendered* fats, *he personally had never bought them.*

Appellant's witness C. H. Eshbaugh, of Chicago, an assistant general superintendent of the appellant company, testified that he had general supervision over the production of beef and other products, including the rendering of fats, and that he had been with Swift & Co. for about 30 years. The witness stated that, at one time before his connection with it, the appellant company had designated a certain section of its plant as its "rough tallow section" or "rough tallow department"; that in that section of the plant, fatty materials and nonfatty materials were separated; that, since that time, an increasing number of products are being used for edible purposes and are known as fancy meats; that the department formerly designated as the "rough tallow department" is now known as the "fancy meat department"; and that many, as he put it, "old timers in our organization" occasionally now refer to that department as the "rough tallow department."

The witness Henry Edward Frieling, testifying for appellant, stated that he was department manager in charge of raw fat and bone material purchases for "the three subsidiary companies of Wilson & Company," one of the so-called "big four packers"; that the "three subsidiary" companies are located in Chicago, Ill., Cambridge, Mass., and Philadelphia, Pa., respectively; that his company had a fleet of trucks for picking up rough fats from retail meat markets, wholesalers, and small packing houses; that the fats were brought to the company's rendering plants; that the term "tallow" was not used to designate any of such *unrendered* fats; that, so far as his company was concerned, the term "tallow" was used to designate *rendered* fats only; that the average daily pick-up in retail meat markets was from 20 to 50 pounds; and that the average daily pick-up from small packing houses was from about 500 to 20,000 pounds. On cross-examination the witness stated that his concern did not buy raw fats as "tallow"; that *he knew that Darling & Co. of Chicago, engaged in the business of rendering fats, purchased raw fats as* "tallow," but that the use of the term "tallow" to describe raw fats was improper.

Appellant's witness H. C. Baumgardner stated that he was in charge of sales of byproducts for appellant in the Produce Exchange in New York; that he personally had been engaged in the purchase and sale of edible and inedible tallow for a period of about 25 years throughout the United States; that his sales were *limited* to *rendered fats, such as edible and inedible tallow,* and that he was a member of the "Tallow Committee" of the New York Produce Exchange. On cross-examination he stated that *unrendered* fats were bought and sold in the trade

and commerce of the United States; that although he was not in the business of purchasing *unrendered* fats, he had never known such fats to be purchased as "tallow"; that *he had made no investigation in the trade to ascertain under what name such fats were sold;* and that his connection with the New York Produce Exchange was such that if *unrendered* fats were dealt in as "tallow," he would know about it. He stated, however, that he could not say that *unrendered* fats were never sold as "tallow."

The witness Samuel E. Henry, testifying for appellant, stated that he was a broker, dealing in tallow, grease, cracklings, and tankage; that he had been so engaged since March 1, 1926, in Chicago; that from 1907 to 1926 he was in the rendering business, making only *inedible tallow;* that he was so engaged, first at Boston, Mass., then at Portsmouth, N. H., then at Toledo, Ohio, and later at Philadelphia, Pa.; that during his connection with the rendering business, he was engaged in picking up shop fats, suet, and bones from retail meat markets, hotels, and small packing houses; that while he was in the rendering business he had heard raw fats referred to as "rough tallow" and "raw tallow" in Toledo only; that the use of the terms "rough tallow" and "raw tallow," as applied to raw fat in Toledo, was probably due to the fact that they were "localisms"; that there were "localisms" in the raw fat trade in different parts of the country as there were in other trades; that he had sold *rendered* fats as "tallow" since 1926 in Massachusetts, New York, New Jersey, Maryland, Illinois, Indiana, Ohio, Kansas, and Missouri; and that he had acted as broker for the Van Hoven Co., Inc., manufacturers of tallow at St. Paul, Minn. On cross-examination *he stated that he had made no inquiry to determine under what name raw fats were bought and sold in the trade, and that since 1926 he had been engaged in dealing in rendered fat only.*

Appellant's witness Henry Manaster, connected with the firm of Harry Manaster & Brother, engaged in the meat-packing business, testified that his company sold beef fat to those who manufactured it into food products, and also some to those engaged in rendering beef fat. The witness stated that his company never sold *unrendered* beef fat as "tallow"; that it sold two grades of fat, No. 1 and No. 2; that the No. 1 grade was sold to H. J. Heinz Co.; and that sometimes the two grades were mixed together and sold as "fat." The witness further stated that his company sold *unrendered* fat to Darling & Co. as "fat," and that, in his opinion, tallow is *rendered* fat. With reference to the No. 1 and No. 2 grades of fat, the witness testified:

Q. You never call it tallow, either one, the first or the second kind?—A. We do not because it is kind of common to call it tallow. When it is rendered, this stuff, it is probably called tallow.

The witness Fred W. Kolk, testifying for appellant, stated that he was employed as bill clerk by Irwin Brothers; that his firm sold scrap beef and mutton fats to restaurants and hotels in small quantities; that greater quantities were sold to Darling & Co.; that he had been associated with Irwin Brothers for 5 years; and that during that period he had never billed any raw fats as "tallow." On cross-examination he stated that the fat sold to Darling & Co. was always billed as "beef fat" or "lamb fat."

Appellant's witness Bert Ziegler testified that he had been connected with the Jacobsen Publishing Co. for 6 years. He was asked to state the purpose of the "Chicago Daily Hide and Tallow Bulletin" (which may be a publication of the Jacobsen Publishing Co., although the witness did not so state), and he said that the publication printed daily quotations on tallow, greases, and oils; that the word "tallow" appearing therein related to *rendered* fats; and that the publication gave no quotations on *unrendered* beef fats. The witness also stated that prior to his connection with the Jacobsen Publishing Co. he had been engaged for 15 years in the packing house byproduct business; that he had never known of fats that were picked up in butcher shops being bought or sold as "tallow," although it was possible that they might have been; that when he was in the packing-house business he was interested in *rendered* products only; and that *he was never interested in, and never handled, any unrendered fats.*

Appellant's witness Otto F. Raiman stated that he had been in the brokerage business, trading in tallow and greases, for 15 years; that his sales of tallow extended throughout the United States; that the tallow he sold was a *rendered* product; that the term "tallow" is applicable to the *rendered* product only; that his custom of designating only the *rendered* product as "tallow" had been definite, uniform, and general throughout his experience; and that he had dealt with Darling & Co., buying and selling *rendered* fats as "tallow." On cross-examination he stated that it was impossible to sell "raw fat" as "tallow" to manufacturers of soap and to others *desiring the rendered product.* There is nothing in the testimony of the witness to indicate that he ever bought or sold *unrendered* fats.

The Government offered in evidence the testimony of several witnesses.

William Henry McCausland, testifying for the Government, stated that he was vice president of Darling & Co. of Chicago; that he had occupied that position for 33 years; that that company was engaged in the rendering and fertilizer business; that he had bought *unrendered* beef and other fats for 33 years as "tallow"; that the territory of which he had charge and in which he purchased *unrendered* fats as "tallow" covered an area of about 250 miles around Chicago, including portions of the states of Michigan, Indiana, Wisconsin, Iowa, and

Illinois; that, in the last 20 years, he had purchased approximately 200,000 pounds of *unrendered* fats as "tallow" per week; that he had purchased from retail and wholesale markets; that he bought *unrendered* fats as "tallow" from whatever source and in whatever quantities possible; that he purchased *unrendered* fats as "tallow" from Harry Manaster & Brother and from Irwin Brothers; and that he had about 90 trucks picking up such tallow.

The Government's witness Carl C. Baas, an employee of the Columbus Rendering Co. at Columbus, Ohio, stated that he had been in the rendering business for the past 25 years; that during that entire period he bought *unrendered* beef and mutton fats as "tallow"; that his purchases were made in Ohio, West Virginia, and Kentucky; that they amounted to about 20,000 pounds per month; that he had been buying *unrendered* fats as "tallow" from Swift & Co. for from 5 to 10 years; that he also purchased from retail meat markets; that his company has 7 or 8 trucks which are used to pick up *unrendered* fats as "tallow"; that the average pick-up of *unrendered* fats as "tallow" from the retail meat markets was from 5 to 200 pounds each; that, in addition to Swift & Co. at Columbus, he purchased from other packers, such as S. S. Logan, of Huntington, W. Va., and McGowan, of Charleston, W. Va.; that the average pick-up from each of those packers of *unrendered* beef or mutton fats as "tallow" was from 200 to 400 pounds; and that when he sold the *rendered* product, it was sold under the terms "'Prime,' or 'Cincinnati,' or 'Chicago Packers'" tallow.

The witness W. H. Fretters, testifying for the Government, stated that he was in the rendering business in Kansas City, Kans.; that he was secretary of his company; that he had been working for the company for 15 years; that during that period he had purchased *unrendered* fats as "tallow" from retail meat markets, grocery concerns, restaurants, hotels, and wholesale meat concerns; that the tallow he purchased was picked up by trucks, apparently owned by the Kansas City Soap Co.; that he was connected with Fretters Brothers Rendering Co.; that the *unrendered* fats were delivered to the Fretters Brothers Rendering Co. by the Kansas City Soap Co.; and that when the fats were rendered, the rendered product was sold, apparently by the Kansas City Soap Co. With which of the companies (the Kansas City Soap Co. or the Fretters Brothers Rendering Co.) the witness was connected as secretary, we are unable to ascertain from his testimony. The witness further stated that for the past 15 years his purchases of *unrendered* fats as "tallow" averaged about 15,000 pounds per week, and that his purchases were made in Kansas City, Kans., and Kansas City, Mo.

The witness Joseph Free, testifying for the Government, stated that he was in the rendering business; that he was manager, renderer,

and treasurer, apparently of the Milwaukee Rendering Co., Milwaukee, Wis.; that his concern purchased *unrendered* beef fats as "tallow" from several packing companies, as well as from retail meat markets; that he had been engaged in buying such products since 1931; that his company purchased from 50,000 to 60,000 pounds per month; that the average daily pick-up of *unrendered* beef fats as "tallow" from each packing house ranged from 200 to 1,000 pounds; that the average daily pick-up from the retail meat markets ranged from 5 to 25 pounds; and that practically all of his purchases were made in the city of Milwaukee. The witness also stated that the *rendered* product was sold to soap makers as *inedible tallow*, and that the usual quantity of such sales was about 60,000 pounds.

The Government's witness Alice Knutila testified that she was manager of T. E. Halford & Co.; that her company, located at Duluth, Minn., was engaged in the business of buying tallow and hides; that it was her duty as manager to buy and sell the products of the company; that she had been with the company for 23 years, and had been buying *unrendered* fats as "tallow" during that entire period; that she *bought* all kinds of *unrendered* beef fat as "tallow" from the packinghouse branches of Swift & Co., Armour & Co., and Hormel, all of which are located at Duluth; that she had also bought *unrendered* beef fats from retail meat markets, located in Superior, Wis., and Duluth; and that she bought approximately 500,000 pounds of *unrendered beef fats* as "tallow" per year. The witness stated that her concern handled two kinds of tallow, *unrendered* and *rendered*, and that, so far as she was concerned and those with whom she came in contact, the purchase of *unrendered* beef fats as "tallow" had been definite, uniform, and general. On cross-examination the witness stated that she usually purchased kidney suet as "suet" and all other *unrendered* fats as "tallow," and that her purchases ranged from about .5 to 500 pounds per pick-up, depending, as she put it, upon "how big the customer is."

The Government's witness John Hauenstein testified that he was a butcher in the employ of a concern known as "Barnick's" in South St. Paul, Minn.; that he had been in the employ of that concern for 6 years; and that he had sold *unrendered* beef fats as "tallow" to appellant, Swift & Co.

The witness Thomas Doherty, testifying for the Government, stated that he was office manager of Van Hoven Co., renderers of tallow and manufacturers of byproducts, soap products, fertilizer, etc., located at St. Paul, Minn.; that he had been associated with that company since 1918; that he was in charge of the picking up of *unrendered* fats; that, prior to 1918, he was in charge of one of the pick-up wagons, picking up *unrendered* fats; that he had been engaged in buying *unrendered* fats as "tallow" for about 50 years; that the purchases

were made from meat markets in quantities ranging from 10 to 100 pounds, depending upon the amount of business of such markets; and that kidney suet is called "tallow" or sometimes "kidney suet," because suet "brings" a little higher price than other *unrendered* fats.

The Government's witness Edwin J. Janssen stated that he was a retail meat dealer and had operated his own market for about 14 years; that he had worked around a meat market as long as he "had been able to do any chores"; that he was president of the St. Paul Retail Meat Dealers Association; that he had sold *unrendered* beef fats as "tallow" to the Van Hoven Co. for approximately 14 years; that the Van Hoven Co. picked up *unrendered* fats from his meat market from one to three times a week; and that the average pick-up was about 50 pounds. The witness stated that through association with other members of the St. Paul Retail Meat Dealers Association he had become acquainted with the method by which they sold *unrendered* beef fats; that they sold such fats as "tallow"; and that about 50 per centum of those members sold their *unrendered* beef fats as "tallow" to the Van Hoven Co. and the other 50 per centum sold them as "tallow" to Swift & Co.

Several witnesses were called by the Government who testified that Armour & Co., packers, located in South St. Paul, Minn., and Chicago, Ill., and Cudahy & Co. of Omaha, Nebr., maintain cost distribution sheets or inter-departmental charges which show that those companies transfer *unrendered* fats from one department to another as "tallow," Cudahy & Co. designating its fats as "rough tallow" or "tallow" and Armour & Co. designating its fats as "tallow suet," "regular tallow," and "scrap tallow."

It will be observed from our rather extensive review of the testimony of record that those of appellant's witnesses who testified that the term "tallow" had a restricted meaning in the trade and commerce of the United States, which included *rendered* beef and mutton fats and excluded *unrendered.* beef and mutton fats, and that such meaning was definite, uniform, and general throughout the United States, had never bought or sold *unrendered* beef or mutton fats, but had dealt only in *rendered* beef or mutton fats, such as edible and inedible tallow. Two of those witnesses, Cosgrove and Williams, frankly stated that they did not know under what name or names *unrendered* beef or mutton fats were dealt in. One of the witnesses, Bullen, employed by appellant, stated that he testified from his observation and experience. However, there is nothing in his testimony to indicate that he ever had any experience in the purchase or sale of *unrendered* beef or mutton fats, and he did not state that he had ever observed any transactions involving *unrendered* beef or mutton fats. Another of those witnesses, Baumgardner, an employee of the appellant company who had never bought or sold *unrendered* beef or mutton fats, and who had never

made any investigation to ascertain how such fats were bought and sold, stated that his connection with the Produce Exchange in New York was such that if those engaged in the business of purchasing and selling *unrendered* beef or mutton fats had bought or sold them as "tallow" he would know about it, and that he had never heard of them being so bought or sold. The witness, nevertheless, stated that he could not testify that such fats were never bought and sold as "tallow."

Only a few of the witnesses called by appellant had either bought or sold *unrendered* beef or mutton fats. The testimony of each of those witnesses was limited to his own personal experience or to that of the company with which he was connected. None of them testified that the term "tallow" had a restricted meaning in the trade and commerce of the United States which was definite, uniform, and general and which included *rendered* beef or mutton fats and excluded *unrendered* beef or mutton fats.

Probably the best testimony offered by appellant was that of the witness Henry Edward Frieling, who had charge of the purchase of *unrendered* fats of "the three subsidiary companies of Wilson & Company," one of the so-called "big four packers," the subsidiary companies being located in Chicago, Ill., Cambridge, Mass., and Philadelphia, Pa., respectively. He stated that, so far as his company was concerned, the term "tallow" was not used in the purchase of *unrendered* fats, and that that term is used only by his company to designate *rendered* fats. The witness stated, however, as hereinbefore noted, that he knew that Darling & Co. of Chicago, engaged in the business of rendering fats (the Government's witness McCausland also testified regarding the business of that company), purchased *unrendered* fats as "tallow."

Assuming, for the purpose of this decision, that the evidence introduced by appellant was sufficient to establish a *prima facie* case, it is evident from the testimony introduced by the Government, as stated by the trial court, that, in at least 11 states of the United States, enormous quantities of *unrendered* beef and mutton fats have for many years been bought and sold as "tallow," some as "rough tallow," "suet tallow," "regular tallow," and "scrap tallow."

It is argued by counsel for appellant that the purchase and sale of *unrendered* beef and mutton fats as "tallow," testified to by the Government witnesses, does not constitute trade and commerce in the United States, because, as we understand the position of counsel, the quantities in which the *unrendered* beef and mutton fats were bought and sold were small as compared with the wholesale quantities in which *rendered* beef and mutton fats were bought and sold. However, many of the purchases referred to by the witnesses for the Government were from packing-house concerns and were obviously in wholesale quantities.

It may be true that the wholesale quantities in which the *rendered* product, edible and inedible tallow, was sold were far in excess of the quantities in which the *unrendered* product was bought and sold. However, that does not alter the fact that *unrendered* beef and mutton fats were dealt in as "tallow" in the trade and commerce of the United States in wholesale quantities.

Counsel for appellant suggests that purchasers of the *unrendered* fats, in most instances, fixed the price of such fats, and that, therefore, the purchases and sales referred to by the Government witnesses ought not be considered as trade and commerce in the United States.

In reply to that suggestion, it is sufficient to say that in the trade and commerce of the United States it is not unusual for the prices of many commodities to be fixed by either the purchaser or the seller, the fixing of such prices depending, to some extent of course, upon market conditions.

For the reasons stated, we are unable to hold that the findings of the trial court are contrary to the weight of the evidence.

The judgment is *affirmed*.