UNITED STATES v. GEORGIA PULP AND PAPER MANUFACTURING CO.
(No. 858).[1]

BARKING MACHINES NOT MACHINE TOOLS.

The importation is of large, power-driven machines, containing a mechanism for revolving logs while the bark on these is cut away by fixed knives. Are these "machine tools," as that term is used in paragraph 197, tariff act of 1909?

By the testimony it is satisfactorily shown that in the machinery trade, prior to the enactment of the tariff act of 1909 and at that time, "machine tools" had taken on in commerce an established meaning that was general, uniform, and definite, and not partial, local, or personal; and that woodworking machines did not fall within the terms and were not commercially known as "machine tools." They were not, accordingly, dutiable as such, but as articles wholly or in part of metal not specially provided for under paragraph 199, tariff act of 1909.—Hedden v. Richard (149 U. S., 346); Pickhardt v. Merritt (132 U. S., 252); Sears, Roebuck & Co. v. United States (2 Ct. Cust. Appls., 329; T. D. 32055).—Myers v. United States (1 Ct. Cust. Appls., 226; T. D. 31260) distinguished.

## United States Court of Customs Appeals, November 27, 1912.

APPEAL from Board of United States General Appraisers, G. A. 7317 (T. D. 32193).

[Reversed.]

*William L. Wemple*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.
*Brown & Gerry* for appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

This case involves the classification and consequent dutiability of machines known as barking or rossing machines, used in stripping the bark from logs of wood. They are large, power-driven machines and contain a mechanism for revolving the logs while the bark is being cut therefrom by the knives of the machine.

They were assessed for duty at the rate of 45 per cent ad valorem under paragraph 199 of the tariff act of 1909. The importer protested this assessment, claiming the machines were dutiable at the rate of 30 per cent ad valorem under paragraph 197 of the same act as "machine tools."

The Board of General Appraisers sustained the protest and the case comes here for review on the appeal of the Government.

No claim is made before us that these machines have been improperly assessed, unless it is found they should have been classified under paragraph 197, and it is therefore only necessary to consider that paragraph, which reads as follows:

197. Cash registers, jute manufacturing machinery, linotype and all typesetting machines, machine tools, printing presses, sewing machines, typewriters, and all steam engines, thirty per centum ad valorem; embroidery machines and lace-making

---

[1] Reported in T. D. 32998 (23 Treas. Dec., 492).

machines, including machines for making lace curtains, nets, or nettings, forty-five per centum ad valorem: *Provided, however,* That all embroidery machines and Lever or Gothrough lace-making machines, machines used only for the weaving of linen cloth from flax and flax fiber, and tar and oil spreading machines used in the construction and maintenance of roads and in improving them by the use of road preservatives, shall, if imported prior to January first, nineteen hundred and eleven, be admitted free of duty.

This paragraph seems without prototype in preceding tariff laws.

The only contention made by the Government before the board and here is that the term "machine tools" as used in the paragraph is a commercial or trade term, and that at the time the paragraph was enacted the definite, uniform, and general understanding of the trade was that the term "machine tools" was confined to metal-working machines, included no woodworking machines, and that therefore the machines here involved could not be classified as machine tools.

Several witnesses were produced by the Government at the hearing before the board in support of the foregoing contention, while none were called upon that issue by the importer.

The board held that the Government's evidence did not establish commercial or trade designation. We consider that question by reviewing the evidence, and incorporate herein the substance of the material part thereof.

James R. Van Dyck testified that he was the president of the Van Dyck-Churchill Co., whose business consisted almost entirely of buying and selling metal and wood working machinery from the manufacturers of those machines, and had been so engaged since 1900; that he was familiar with the buying and selling operations of the firm, and in the course of the business had become familiar with the expression "machine tools" as used in the trade, and was so familiar therewith prior to August 5, 1909; that the company had branch houses in Pittsburgh, Philadelphia, and New Haven; that he personally had direct dealings with customers; that the term "machine tools" as used and understood in the trade applied to machines for working metal; that he had never known a woodworking machine to have been bought or sold or classified as a machine tool; that there were many machine-tool concerns in the country, and that he knew the class of goods that a great many of them handled and that it was metal-working machines; that the business of his company was chiefly confined to the handling of metal-working machines. On cross-examination he said that throughout the United States the common application and understanding of the term "machine tools" was limited to metal-working machines.

Edward T. Hendee testified that he was and had been connected with Joseph T. Ryerson & Co., Chicago, for 8 years; that the principal business of this company was buying and selling manufactur-

ing machinery; that he had come in contact with the trade during all this time; that there were many concerns in this country with which he was familiar that made, bought, and sold machinery and machine tools; that the term "machine tools" as used in the trade was applied to metal-working machines and not to woodworking machines; that his firm had handled woodworking machines incidentally; that he traveled throughout the country as occasion demanded selling machinery, most of which was metal working; that he had bought and sold second-hand plants and in so doing had bought and sold woodworking machinery.

A. E. Newton testified that he was general manager of the Prentice Bros. Co., Worcester, Mass., manufacturing, using, and selling machine tools; that he was vice president of the Brownell Co., of Providence, R. I., which handled machine tools, woodworking machines, and a general line of machines, and had been connected with the former concern 14 years; had been vice president of the latter $3\frac{1}{2}$ years, and was with it prior thereto; that the business of Prentice Bros. Co. extended all over the country east of the Mississippi River; that he had come in direct contact with the trade in connection with the business of buying and selling these products and had become familiar with the expression "machine tools"; that as used in such trade it was understood to refer to machines used in cutting metal for producing other machines and parts of other machines; that he had bought woodworking machinery; that his experience in selling the same was limited; that the Brownell Machine Co. sold the products of several manufacturers of machine tools, which he named.

F. W. Parker testified that he was a dealer in machine tools; that he was connected with the Niles-Bennet-Pond Co., who were manufacturers and who took the greater part of the output of six other plants; that he had been in the business 10 or 11 years, and that he had been personally familiar with the selling of these products for 10 years; that the term "machine tools" was one used in the trade and always had been, so far as he could remember; that it related to metal-working machines and not to woodworking machines; that the latter were always spoken of as woodworking machines and not as machine tools.

Howard V. Lewis testified that he had been in the business of buying and selling machine tools with Fairbanks & Co. for nearly 9 years; that he had sold some woodworking machines; that the trade practice was to distinguish between woodworking machines and machine tools; that the business of the Fairbanks company covered nearly the entire eastern half of the United States; that the term "machine tools" was a trade term generally used through the United States as far as his experience went; that he understood

the term "machine tools" to mean in a commercial way mechanical appliances operated by power other than hand power, which, through the use of a cutting tool used in connection with the appliance, are capable of working metals, and that that was the understanding of the people through whom he bought and to whom he sold machines.

L. C. Conner testified that he was in the business of selling woodworking machinery with the American Wood Working Machine Co., and had been connected with the selling of its products for about 10 years ; that it made from 150 to 200 kinds of woodworking machines; that prior to August 5, 1909, its total sales were over $1,500,000, with a yearly business some years of approximately $400,000; that in his trade the term "machine tools" was not used in connection with their products, but that the machines made by his company were sold under the general name of woodworking machinery; that he could not say that he ever heard them described by any other general name; that in the course of the time he had been with the company they had sold all over the country; that some of the time he had been personally so engaged, and some of the time he had charge of the salesmen, answered their letters, and gave them instructions.

These witnesses all agreed that they had not made, sold, or handled machines like the importations in this case.

The witnesses when cross-examined did not agree in several instances as to whether a given machine for the working of metal would or would not be a machine tool within the trade understanding, but they were at no disagreement that a machine tool was in the trade understood to be one that worked metal in some manner and was limited thereto.

It also appeared in evidence without contradiction that for at least 10 years there has been in existence a trade organization known as the National Machine Tool Builders' Association, which now has a membership of over 100 concerns, whose principal business, the evidence tended to show, was the merchandising of machines used in working metal.

It also appeared that many of the concerns who handle such machines use the term "machine tool" as a part of their business name.

We pause here for a brief consideration of the doctrine of commercial designation as applied by the Supreme Court. It is settled that—

With regard to the language of commerce, the general rule laid down by this court is that it must be construed, when used in laws imposing duties on importations of goods, and particularly when employed in the denomination of articles, according to the commercial understanding of the terms used. * * * While it is true that "language will be presumed to have the same meaning in commerce that it has in ordinary use, unless the contrary is shown," * * * yet "the commercial designa-

tion of an article among traders and importers, where such designation is clearly established, fixes its character for the purpose of the tariff laws; * * * a specific designation *eo nomine* must prevail over general terms, and a commercial designation is the standard by which the dutiable character of the article is fixed." * * * This rule is equally applicable where a term is confined in its meaning not merely to commerce but to a particular trade, and in such case also the presumption is that the term was used in its trade signification. * * * A tariff law may use language not intended for the community at large, but for merchants, or for a particular trade, and such as to mislead those for whom it is intended if not taken in the commercial or trade sense. Hedden *v.* Richard (149 U. S., 346, 349).

It has long been a settled rule of interpretation of the statutes imposing duties on imports that if words used therein to designate particular kinds or classes of goods have a well-known signification in our trade and commerce different from their ordinary meaning among the people, the commercial meaning is to prevail unless Congress has clearly manifested a contrary intention; and that it is only when no commercial meaning is called for or proved that the common meaning of the words is to be adopted. Cadwalader *v.* Zeh (151 U. S., 171, 176).

It does not need the citation of authority that evidence of commercial designation must show that the claimed commercial meaning is general, uniform, and definite, and not partial, local, or personal, and that this meaning must be that which is so used in the wholesale trade which handles the merchandise involved.

As to merchandise the subject of trade at the time the statute was enacted, the evidence of commercial designation must relate to the designation of that merchandise in the trade and commerce of the country at and before the enactment of the statute, but tariff laws are made for the future as well as for the present, and if the imported merchandise was not in existence or was not known to commerce prior to the enactment of the law, but subsequently becomes so, then an applicable commercial designation in use at the time the statute is enacted reaches out and embraces such subsequent merchandise. Pickhardt *v.* Merritt (132 U. S., 252, 257); Newman *v.* Arthur (109 U. S., 132, 138).

It is well understood that prior to the enactment of paragraph 197 the great bulk of imported machines and machinery had been assessed for duty under paragraph 199 of the same act, or its predecessors, as articles composed wholly or in part of metal, and therefore it is plain that by the provisions of the new statute (par. 197) Congress was seeking for reasons of its own to exclude from paragraph 199 certain machines and machinery, including machine tools, and to give to them the benefit of a lower rate of duty. The other articles referred to in paragraph 197 would in the main seem easy of ascertainment by reason of the use to which they are devoted, with the exception of steam engines, which is probably a term not difficult of understanding because of the motive power required, and hence it is desirable that in construing the term "machine tools" resort, if possi-

ble, should be had to the commercial understanding of that term. The fact that machines and machinery, one or the other of which terms must include machine tools, are in such great quantities the subject of commercial transactions in this country adds emphasis to this conclusion.

It is unfortunate that Congress did not find itself able or in a position to use some term more explicit in meaning than the one under consideration, although it may be that it was considered that it would be better to leave that to the trade itself to determine, rather than to undertake to accurately define it, or it may have been thought that the use for which the machine was designed would be held to be the determinative consideration, as that seems to be, as we have said, the determinative factor as to practically all the other mechanical appliances mentioned in paragraph 197. But, however this may have been, it is, of course, our duty to construe the term as best we may, and, if we err, Congress can readily correct the error by the use of unambiguous language.

As we have seen, the commercial meaning of tariff language is presumed to be the common meaning and will be so applied unless and until a different commercial meaning is claimed and proved. Such different meaning is held to be a question of fact to be proven like any other controverted issue of fact in litigated cases, and upon him who raises the issue falls the burden of maintaining the same by competent proof, and this burden must be discharged under the rule that requires affirmative proof in civil cases by a fair balance of the evidence. That burden the Government has assumed. Thereunder it must show that in the trade and commerce of the country the term "machine tools" is used and that it has a general, uniform, and definite meaning; that is, that it is general as extending over the entire country; that it is definite in that it is certain of understanding and not ambiguous; and that it is uniform in that it is the same everywhere in the country. If, within these rules, such a commercial meaning of the term "machine tools" be shown as does not embrace the merchandise involved in this case, the burden assumed by the Government has been discharged.

From the recited and uncontroverted evidence we think it satisfactorily appears that in the machinery trade there had come to be adopted prior to the enactment of the tariff act of 1909 the term "machine tools"; that it was general, uniform, and definite, and not partial, local, or personal. It is true that it was definite only in that it was applied to machines that worked metal, but this can not be said to be ambiguous, because the term "metal-working machines" possesses absolute certainty of meaning. In addition to this the Government has also shown that in the trade and commerce relating

especially to the great class of woodworking machines to which these before us belong the term "machine tools" was not known and was not used.

· The fact that there may be some metal-working machines that were not commercially known as machine tools does not affect this case, in view of the fact that the merchandise here is excluded from the commercial meaning of the term "machine tools."

The importer strenuously contends that because there is no evidence which tends to show that the trade which handles these rossing machines does not call them machine tools or know them as such that the law as to commercial designation is not applicable thereto. It further claims that these machines are articles which are not the subject of general trade and are not kept in stock, but are sold on order by the manufacturer for special purposes in lots of one or two.

Passing the inconsistency in these two claims, we think for the purposes of this case the record is barren of any facts which entitle the importer to the benefit, if benefit could accrue to it thereby, of either of these claims. The record is entirely silent as to whether or not there has ever been any importations of these machines before those here involved and also equally silent as to whether they are or are not kept in stock or only sold upon order. All that appears from the record in this regard is that these machines are manufactured in Canada; have been made there for some 10 years, and that the importations here involved, which consist of two entries, were made in 1910.

In Pickhardt v. Merritt (132 U. S., 252), the question before the Supreme Court was whether four dyes or colors should be classified as "aniline dyes and colors by whatever name known." The merchandise was not known in commerce at the time the paragraph in the quoted phraseology was enacted, and the undisputed evidence seems to have been that the merchandise was not aniline dyes or colors in fact, but was coal-tar colors or dyes. Evidence of commercial designation was admitted to show that the words "aniline dyes" was a commercial term and applied in the trade to all dyes derived from coal tar or artificial dyes. The Supreme Court said that "the court instructed the jury that if the four articles in question according to the understanding of commercial men, dealers and importers of them, would, when imported, 'be included in the class of articles known as aniline dyes, by whatever name they had come to be known,' they were subject to duty as aniline dyes, and the defendant was entitled to a verdict," and that it saw no objection to this instruction.

Now, if in that case it was proper to hold that the merchandise, if it came *within* the commercial meaning of the term "aniline dyes," would be dutiable as such, it must be equally sound to say that if

merchandise like that involved here falls *outside* the commercial meaning of the term "machine tools," it is excluded from that classification. Not only is this conclusion warranted by the authority of the Pickhardt case, but we believe it to be sound in principle, because if there was in existence at the time the statute was enacted the commercial term "machine tools," all machinery must be either within or without that classification, and, unless otherwise provided, its classification would be thereby controlled.

It is said in argument that if a commercial designation be here applied it results in a conclusion contrary to that which this court reached in the case of Myers *v.* United States (1 Ct. Cust. Appls., 226; T. D. 31260).

In that case, as in the case of Sears, Roebuck & Co. *v.* United States (2 Ct. Cust. Appls., 329; T. D. 32055) we considered the same paragraph of the statute that is involved in this case. At the outset it will be observed that no question of commercial designation was made in either of those cases, and we were compelled to rely upon the common understanding of the term "machine tools" in their disposition.

The Myers case involved floor-planing machines. From the record in the case and opinion of this court it appears that these machines were portable, somewhat resembling in form a lawn mower, and were used and moved around with the hand of the operator or workman in about the same manner as one would use a carpet sweeper. In the body of each machine was a shaft upon which were a series of steel planing knives. An electric motor was attached to the top of the planer and by the power thus furnished the knives were made to revolve with much rapidity and plane the floor over which the machine was moved by hand.

The Sears-Roebuck case involved steel hair clippers of the kind commonly used by barbers in cutting hair. It was held they were not machine tools, and further that the term "always connotes the application of some kind of power to an implement or tool for its use and operation other than hand power alone." It was further said that the term "seems rather to apply to such tools only as are used in mechanical work dealing with wood, metal, or stone."

We are still of opinion that in the common understanding the term "machine tools" refers to machinery driven by motive power other than that of the hand of the operator and that it usually if not always relates to no machines that do not operate upon metal, wood, or stone.

Without the aid of knowledge of a commercial meaning of the term "machine tools" its application must always be involved in considerable if not great uncertainty. The lexicographers do not agree in a precise definition thereof and we have not yet been able to formulate a definition satisfactory to ourselves. Aided by the

evidence as to commercial designation in this case, it would seem that a machine working metal and capable of producing machines or parts thereof in a relatively finished condition would be a machine tool included within the commercial meaning of that term.

We hold that the Government in the case at bar has established the commercial meaning of the term "machine tools" as used in the paragraph, and it follows therefore that these rossing machines are not entitled to be classified for duty as the importer contends.

The argument in this case upon both sides proceeds upon the theory that but for the evidence of commercial designation these rossing machines would, under the authority of the Myers case, be classified as machine tools in the common understanding of that term. Lest there may be some misconception as to the effect of that decision we take occasion to say that upon the record it is not clear that such would be the case. The evidence here, except by reference to Exhibit No. 1, which is a small pamphlet describing the Moreau barking machine, does not disclose the size, weight, and many other particulars of its construction. From the pamphlet, however, we learn that it is made in two sizes; that it will peel logs of from 3 to 50 inches in diameter and from 4 to 6 feet in length; that it is 5 feet wide and 10 feet long and weighs from 4,500 to 6,000 pounds, according to the size; that the cylinders carrying the knives by which the barking is done make from 1,000 to 1,200 revolutions per minute and may be increased to 1,500; that it contains shafts, bearings, and other appropriate metal parts natural and suitable for a machine of that size and weight, and requires 6-horse motive power to successfully propel the same. How many operators, if more than one, are required in its use does not appear.

The foregoing description illustrates the great difference between it and the floor planers before this court in the Myers case. Those floor planers were easily portable; were guided and moved around by the hand of the operator; the motive power itself must have been small, and the manner of its operation most analogous to that of the hand tool by which the same work was once and is now performed. The portability of those planers and the fact that they were used by one operator was thought to so partake of the characteristics of a simple tool, and their mechanical construction and the fact that they were driven by motive power other than the hand of the operator to so partake of the characteristics of a machine that the combination was a machine tool in the common understanding of the term, but it does not follow that in the common understanding alone the machines before us, when their size and lack of portability are considered, should be held to be machine tools.

It follows from what we have said that the judgment of the Board of General Appraisers is *reversed.*