(C. D. 1906)

HAUSER & REISFELD, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 16, 1957)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General. (*Henry J. O'Neill,* trial attorney), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Rao, Judge: Certain imported merchandise, invoiced as "Steel Thonging Needles," was assessed with duty at the rate of 30 per centum ad valorem, pursuant to the provision in paragraph 343 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, for tape needles. This assessment has been challenged by timely protest wherein it is alleged that said needles are entitled to free entry as hand sewing needles, by virtue of the provisions of paragraph 1724 of said act.

The respective provisions of law read as follows:

Paragraph 343, as modified by T. D. 51802, *supra*:

Tape, knitting, and all other needles, not specially provided for, and bodkins of metal_____30% ad val.

Paragraph 1724:

Needles, hand sewing or darning.

Samples of the needles in issue were introduced into evidence at the trial of this action as plaintiff's collective exhibit 1. They are described as being "made of a single piece of steel folded upon itself and stamped out in the form of a blunt point needle, 2¼ inches in length and tapering off from top to bottom for the blunt point, * * * at the top * * * the needle is split at the fold or joint for a distance of about a half-inch, one section containing a slit or slot about a quarter inch long and the other two prongs or teeth, so placed as to be able to jut through the slit or the slot."

According to the evidence introduced on behalf of plaintiff, through its witnesses, Arthur Reisfeld, who for 9 years has been vice president of plaintiff, and Arthur Rosenblum, who has for 19 years been engaged in the business of selling arts and crafts supplies, with the Art Hand-

craft Co., these needles are used in the arts and crafts field for the making of wallets, key cases, and the like. In this use, pieces of leather are stitched together by means of the instant needle and a leather or plastic thread or lace, such as are represented by plaintiff's illustrative exhibit 3 (leather lace) and plaintiff's illustrative exhibit 4 (plastic lace). The lace is either threaded through the eye and held by the prongs, or is merely placed in the split end of the needle and held by the prongs, the latter method being demonstrated by defendant's illustrative exhibit A. The sewing operation is performed by hand and involves punching holes in the leather and uniting the pieces by means of cross-stitches, single or double buttonhole stitches or overcasting.

Witness Reisfeld described a tape needle as a "blunt needle that takes a woven tape and leads it through the whole body of some tape or fabric," such as a curtain or pajamas, but does not make stitches. He also stated that a harness needle, of the type in evidence as plaintiff's illustrative exhibit 5, which has a blunt end, is not capable of perforating leather and can only be used after the leather has been punctured.

In the opinion of witness Rosenblum, the needle at bar is a leather needle, known in the arts and crafts trade as a hand sewing needle.

On the part of the defendant, testimony was elicited from one Otto Ettlinger, an individual engaged in the art needlework supply business since 1902. It appears from his testimony that he has imported all kinds of sewing and embroidery needles and has sold them throughout the United States, but he had never before seen a needle like plaintiff's collective exhibit 1.

He stated that there was a class of needles known as hand sewing needles, at and prior to June 1930, and that the trade understanding of that term was of "a [single] needle with an eye carrying a thread through the eye, working up and down through some sort of a material." It was the opinion of this witness that the instant needle would not be included within the trade understanding of the term "hand sewing needles," because, although it has an eye, it does not hold the thread through the eye.

On cross-examination, Ettlinger stated that he was aware of a variety of needles embraced within the term hand sewing needles. These included beading, chenille, darning, embroidery, harness, mattress, sack, and sail needles, some of which have pointed ends, others blunt ends. As to those with blunt ends, it is, of course, necessary to perforate the fabric before they can be used. In the opinion of this witness, while a pointed end is not a necessary characteristic of a hand sewing needle, an eye is.

Ettlinger defined sewing as "stitching through material up and down." "Making a stitch through the material." His definition, he stated, did not include the binding together of two pieces of leather, as stitching requires a "going through," not a "going around," which latter he described as overlapping. He considered harness needles, which work up and down, as hand sewing needles.

This witness agreed with the following definition of the verb "to sew," taken from Webster's New Collegiate Dictionary:

**1.** To unite or fasten by stitches made with thread and needle. **2.** To affect or bring by sewing;—often with *up*; specif., to close or enclose by sewing.—*v. i.* To practice sewing, esp. as an occupation.

Nevertheless, he asserted that sewing requires a "down movement."

Under questioning by the court, Ettlinger testified that he had dealt in tape needles in the wholesale trade of the United States. He defined a tape needle as a bodkin, a blunt needle, either with an eye or prongs, for holding tape or string, designed to carry the tape or string through some material, usually used for pulling laces or ribbons through holes in garments. He stated that plaintiff's collective exhibit 1 possessed the characteristics of tape needles or bodkins as he called them at and prior to June 1930, in that they are made in two sections to hold material between the prongs. "They are not made with just an eye."

We have dwelt at some length upon the testimony of the witness Ettlinger for the reason that it is strenuously urged by counsel for the defendant that the needles at bar were not within the commercial designation of the term "hand sewing needles" at and prior to June 17, 1930. Although the competency of a witness to testify concerning the commercial meaning of a tariff term is not dependent upon his having seen or dealt in particular imported merchandise (*United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T. D. 32998; *Lamont, Corliss & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 488, T. D. 43224), there is little in this record to establish commercial designation within the strict dictates of settled law. To advert to the oft-repeated phrase to be found in the case of *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T. D. 42641, "Commercial designation is a thing often claimed in customs litigation and rarely established." It requires, at the least, affirmative proof that there existed in the trade and commerce of the United States, at and prior to the enactment of the tariff term under construction, a commercial meaning of such term, different from its common meaning, which is uniform, definite, and general throughout

the United States, to the end that it may be assumed that Congress had knowledge of such commercial understanding and legislated with reference to it. *Jas. Akeroyd & Co. et al.* v. *United States, supra*; *Moscahlades Bros., Inc.* v. *United States,* 42 C. C. P. A. (Customs) 78, C. A. D. 575.

As stated in the case of *Nylos Trading Company* v. *United States,* 37 C. C. P. A. (Customs) 71, C. A. D. 422:

> Tariff laws are to be interpreted according to the common meaning of their terms, or according to their commercial designation where the latter differs from the common meaning. *Hummel Chemical Co.* v. *United States,* 29 C. C. P. A. (Customs) 178, 183, C. A. D. 189; *Stephen Rug Mills* v. *United States,* 32 C. C. P. A. (Customs) 110, 115, C. A. D. 293. Congress is presumed to know the language of commerce, and the object of the tariff act is to classify substances according to the general usage and denominations of trade. The first and most important thing to be ascertained in construing a tariff act with regard to an article therein mentioned is *its* commercial designation. A distinction once made by Congress concerning a commodity must be applied in the future in the absence of a contrary legislative intention. *American Express Co.* v. *United States,* 10 Ct. Cust. Appls. 275, 286, T. D. 38680; *United States* v. *Davies Co.,* 11 Ct. Cust. Appls. 392, 395, T. D. 39317. The commercial meaning of tariff terms is presumptively the common meaning. The burden of proof is on the one claiming a different meaning to establish it by a preponderance of the evidence. *United States* v. *Georgia Pulp and Paper Manufacturing Co.,* 3 Ct. Cust. Appls. 410, 415, T. D. 32998. A commercial designation is the result of established usage in commerce and trade which is definite, uniform, and general, *United States* v. *Kwong Yuen Shing,* 1 Ct. Cust. Appls. 14, T. D. 30773; *United States* v. *Burlington Venetian Blind Co.,* 3 Ct. Cust. Appls. 378, T. D. 32967, and where the trade meaning is universal and so well understood that it is presumed Congress and the trade were fully acquainted with the practice when the tariff act was passed. *United States* v. *Fung Chong Co.,* 34 C. C. P. A. (Customs) 40, 42, C. A. D. 342. Where the Government contends that an *eo nomine* designation in the tariff law is a commercial or trade term excluding merchandise the subject of a protest, it must prove that as used in commerce the term has a meaning which is *general,* extending over the entire country; *definite,* certain of understanding; and *uniform,* the same everywhere in the country. *United States* v. *Georgia Pulp and Paper Manufacturing Co., supra.* * * *

What defendant's witness has testified to was his interpretation of a trade understanding of the term "hand sewing needles" with the merchants with whom he came in contact at and prior to June 1930. Aside from the statement that this witness' company sold needles at wholesale throughout the United States, there is no showing of the extent to which the so-called trade understanding was definite, uniform, and generally accepted. Merely because this witness asserted that he comprehended the way in which the needles at bar functioned—"It has an eye, but it don't hold the thread through the eye"—is far from sufficient proof that the subject needles would not be considered to be hand sewing needles under a uniform, definite, and general definition of that term in the trade and com-

merce of the United States at and prior to the date the present tariff act became a law.

It must be borne in mind that the witness for the defendant, prior to the instant trial, had never seen a needle of the kind here in issue. His likening it to a tape needle or bodkin, which he defined as one with an eye for holding a tape used usually for pulling laces or ribbons through garments, must underlie an inherent belief on his part that the needles at bar do not sew.

The evidence to the contrary is clear and convincing. Two witnesses with considerable experience in the arts and crafts trade stated unequivocally that these needles are used to join together pieces of leather by means of various manipulations which are well recognized as sewing stitches. It requires no citation of authority and is a matter which may be judicially noticed that cross-stitching, overcasting, and buttonhole stitching are types of stitching effected by sewing.

Needles used by other artisans in the performance of their respective trades have long been recognized as falling within the common concept of the term hand sewing needles. In the case of *O. G. Hempstead & Son* v. *United States*, T. D. 13502, G. A. 1804, it was held that needles of the kinds used by sailmakers, harnessmakers, mattressmakers, and upholsterers were hand sewing needles.

In the case of *A. J. Woodruff & Co. and F. A. Koch & Co.* v. *United States*, 6 Treas. Dec. 959, T. D. 24795, affirmed, 9 Treas. Dec. 291, T. D. 26074, wherein surgical needles were held not to be hand sewing needles, it was stated:

> The testimony of the importers' witness shows that the term hand sewing needles is not a trade name. Regarding this as true, we must determine the classification of the merchandise according to common understanding. Beyond all question, the term hand sewing needles, as commonly understood, includes only that species of needle which is used by tailors, seamstresses, sailmakers, and other artisans for sewing fabrics or other material by hand. Surgical needles are always understood and recognized as a distinct class by the name "surgical needles."

We apprehend no basis for distinguishing between leather makers' needles on the one hand and the various other craft needles, hereinabove enumerated. Differences in construction and appearance as between the curved needle of the upholsterer and the triangular needle of the sailmaker have never been considered as bearing upon the question. The criterion is whether the needle is used for sewing fabrics or other material by hand. Measured by that standard, the needles at bar are hand sewing needles, and we so hold. The claim in the protest for free entry within the provisions of paragraph 1724 of the Tariff Act of 1930 is, therefore, sustained.

Judgment will be entered accordingly.