(C. D. 2056)

F. B. VANDEGRIFT & CO., INC. v. UNITED STATES

United States Customs Court, Second Division

(Decided December 16, 1958)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This case relates to two importations of merchandise described on the invoices as "Parts of one Hydraulic 1800 tons Extrusion Press Plant," valued at about $250,000. The articles are illustrated by a schematic drawing which is in evidence as exhibit 1.

The collector of customs classified the merchandise as "Machine tools" in paragraph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and imposed duty at the rate of 15 per centum ad valorem.

Plaintiff contends by its protest and by amendment thereof that the importations should be classified either in paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, as articles having as an essential feature an electrical element or device, and dutiable at the rate of 13¾ per centum ad valorem, or at the same rate in paragraph 372 of said act, as modified by the Torquay protocol to said general agreement, *supra*, as machines, not specially provided for.

## THE STATUTES

Paragraph 353, as modified, *supra*:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    \*      \*      \*      \*      \*      \*      \*

    Other \* \* \* _____ 13¾% ad val.

Paragraph 372, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra*:

Machines, finished or unfinished, not specially provided for:

    \*      \*      \*      \*      \*      \*      \*

    Other \* \* \* _____ 13¾% ad val.

Paragraph 372, as modified by the General Agreement on Tariffs and Trade, *supra*:

Machine tools (except jig-boring machine tools)_____ 15% ad val.

Paragraph 372, as enacted, contains a proviso which reads:

*Provided further*, That machine tools as used in this paragraph shall be held to mean any machine operating other than by hand power which employs a tool for work on metal.

The only witness in the case, William T. Bomboy, was called by the plaintiff. The substance of his testimony is that he is a plant engineer with the Riverside Metal Co., the ultimate consignee of the merchandise in controversy. The Riverside Co. is engaged in the manufacture of phosphor bronze, nickel silver, and beryllium copper in the form of wire, rod, sheet, and strip. He was involved "in the initial engineering for this press to meet a specific purpose." He participated in "The preparation of the engineering and prints on the foundation, the installation, and then also the maintenance of the press after the installation." During the 34 years of his association with the Riverside Co., he had become thoroughly familiar with the machines and machinery used in that plant. The witness described exhibit 1 as a schematic drawing of the extrusion press itself. "When counsel referred to 'plant' it means that there are other pumps and accumulators and motors that are in another area which develop the pressurized water that is forced into this cylinder which forces a ram outward." The extrusion press itself is approximately 30 feet long and 10 feet wide. However, the overall area containing all the equipment necessary to operate the press is about 40 feet by 60 feet. "That would include a motor, a three-crank pump, an accumulator station, a reserve water tank, the necessary master valves, the necessary electric controls, and also a pressure relief tank. * * * we have a motor, a 350 horsepower motor which is energized, which in turn activates the pump." The motor is energized by electricity. The pump referred to is a water pump which pressurizes the water, and the water flows under pressure into an accumulator station which acts as a reserve of pressurized water, so that in the operating cycle of the press there will be enough power to continue it through its full cycle of operation. The hydraulic power accumulator is equipped with electrical floating valves which operate when the water gets to certain levels, this being essential to the efficient operation of the accumulator station.

By a control system, the water in the accumulator station moves into a cylinder which forces a ram forward on the press with 1,800 tons pressure. A billet container is electrically heated so that metal, when it is being extruded, will flow when it has reached the temperature of 1,200 degrees Fahrenheit. After the billet is placed into the container, the ram moves forward and exerts pressure against the billet which moves around in a die and converts the billet into the form of a rod. The witness summed up the entire objective of the mechanism "* * * to reduce and move metal around a mold or die into a longer section." The diameter of the billet which is used is 5½ inches, its length 16 inches, and the extruded product is 1 inch in diameter and 30 feet long.

The United States, defendant, seeks to support the action of the collector of customs herein upon the authority of the decision of our appellate court in *Alex. Benecke* v. *United States*, 30 C. C. P. A. (Customs) 55, C. A. D. 214. The merchandise before the court in that case consisted of rollers imported for installation in a rolling mill used in cold-rolling steel. It was shown that a complete rolling mill was a large heavy structure, from 8 to 12 feet high, having a heavy metal frame into which the rolls were fitted, the frame being designed to hold the rolls in such position relative to each other that they would operate properly in shaping material passed between them. The issue there was whether the imported rollers were properly classifiable for tariff purposes as parts of machine tools in paragraph 372 of the Tariff Act of 1930, or as parts of machines in the same paragraph. Applying the doctrine of legislative ratification of judicial interpretation, the court held that the case was controlled by the decision of the Board of General Appraisers (now the United States Customs Court) in *John L. Vandiver* v. *United States*, 34 Treas. Dec. 200, T. D. 37555, wherein a complete rolling mill was held to be a machine tool, as that term was defined in the Tariff Act of 1913 and restated in the Tariff Acts of 1922 and 1930, respectively.

In another case, upon which defendant relies, *August F. Stauff & Co., Inc.* v. *United States*, 15 Cust. Ct. 255, Abstract 50436, it was held that certain articles, which were conclusively shown to be integral parts of an extrusion press, were within the congressional definition of what constitutes a machine tool in said paragraph 372.

Plaintiff, however, contends that the *Benecke* case is distinguishable factually and legally; that the court there recognized the fact that there were certain devices that employed a tool for work on metal which might not be machine tools; that "those devices that employed a tool that cut or hammered fell within the provision, but that was the extent of the holding."

It is true that, in the *Benecke* case, the court made the statement that while the definition of a machine tool in paragraph 372 "* * * limits machine tools to those used in the metal working art, it does not necessarily mean that all devices used in that art are machine tools." The court was there referring to an earlier case—*United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T. D. 32998—wherein it was held that large power-driven devices used to cut bark from logs were not machine tools. That conclusion, however, was governed by proof of commercial designation to the effect that such devices for working upon wood were not machine tools within the commercial understanding of the meaning of that term.

Furthermore, plaintiff contends that, in the present case, "There is no tool working upon metal in an extrusion process"; that "The

'tool,' if any, that does the work is the metal itself when it pushes against the stationary mold. The stationary mold has no inherent force or power that 'works' on the metal * * *."

This contention is well answered in the brief of defendant, wherein it is stated that—

* * * even if it is true that the metal works on the die, the Court may properly note an elementary principle of physical matter, that to every action there is an equal and opposite reaction, and if the metal be considered as working on the die in the extrusion press, it is obvious that the die in the press works just as hard on the metal.

Plaintiff urges that the *Stauff* case should be distinguished, asserting that the record in that case was "not complete and did not properly explain how a hot extrusion press operated; also that the features of the press here under consideration that distinguish it from a cold-rolling mill (concededly a machine tool—*Alex. Benecke*—*supra*), as pointed out above, were not called to the attention of the court in that *Stauff* case." We are not impressed with this line of reasoning.

Based upon the evidence, the extrusion press is not only a machine tool but also is an article having as an essential feature an electrical element or device within the terms of paragraph 353, as modified, *supra*, and would be so classified, unless otherwise more specifically provided for.

It is our opinion, in view of the record before us, that the reasoning and decisions in the *Benecke* and *Stauff* cases, *supra*, lead logically to the conclusion that the extrusion press here in controversy was properly classified for duty as a machine tool in paragraph 372, as modified, *supra*, which provision of the tariff act is an *eo nomine* and definitive designation.

Accordingly, judgment will issue overruling the protest.